UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| CRAIG SHAW and KATIE SHAW, | Case No. 20-CV-534 (NEB/TNL) |
| Plaintiffs, | |
| v. | ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT |
| FARM BUREAU PROPERTY & CASUALTY INSURANCE COMPANY, | |
| Defendant. | |

Craig and Katie Shaw (together, the "Shaws") own a house that experienced fires on two separate occasions in 2019. Their insurer, Farm Bureau Property & Casualty Insurance Company ("Farm Bureau"), determined that the first fire was a partial loss and issued a payment for the claim. Farm Bureau then found that the second fire resulted in a total loss but refused to pay the full dwelling coverage amount. The Shaws instituted this breach of contract action, and both parties move for summary judgment on the issue of whether Farm Bureau is obligated to pay the Shaws for the full coverage amount for the second fire. (ECF Nos. 28, 35.) For the reasons that follow, the Court grants the Shaws' motion for summary judgment and denies Farm Bureau's cross-motion.

BACKGROUND

The Shaws own a house and property located in Adams, Minnesota. (ECF No. 1 ("Compl.") ¶ 3.) To insure the house, the Shaws purchased a homeowners policy from

Farm Bureau that ran from February 3, 2019, to February 3, 2020. (*Id.* ¶ 7; ECF No. 5 ("Ans.") ¶ 3; ECF No. 31-1 ("Policy") at 2.)[1] The Policy's dwelling coverage limit is $268,800. (Compl. ¶ 8; Policy at 3.) The Policy states that "[t]he coverages you chose apply to each accident, 'occurrence' and loss that takes place during the policy period." (Policy at 10.) The Total Loss Valuation provision states in part:

> In the event of a total loss of the dwelling insured under this module, the limit of insurance indicated in the Declarations represents the total value of the dwelling insured.
>
> Dwellings in the process of being constructed shall be valued at the actual value of that portion of the dwelling completed at the time of loss.[2]

(*Id.* at 46.)

The Shaws' house was the site of two fires in 2019. The first fire, in March 2019, resulted in a large hole in one exterior wall of the house. (Compl. ¶ 11; Ans. ¶ 6; ECF No. 38-1 at 2.)[3] The Shaws submitted a claim to Farm Bureau, and Farm Bureau determined that the Policy covered the fire and that the claim was a partial loss. (Compl. ¶¶ 12–14; Ans. ¶ 6.) Farm Bureau issued a payment based on the actual cash value of the damage to the structure. (Compl. ¶ 14; Ans. ¶ 6.) After the March fire, Farm Bureau did not reduce the dwelling coverage on the structure or refund any of the annual premium

---

[1] Page numbers cited for the Policy refer to the ECF page numbers.

[2] This provision is consistent with Minnesota's valued-policy statute, Minn. Stat. § 65A.08, subdiv. 2(a), discussed *infra*.

[3] Page numbers cited for the exhibits at ECF No. 38-1 refer to the ECF page numbers.

the Shaws paid. (Compl. ¶¶ 15–16; Ans. ¶ 6.) Farm Bureau hired a roofing crew to secure the roof of the house. (ECF No. 38-1 at 4.) Mr. Shaw testified that after the fire, the Shaws noticed evidence of vandalism and efforts by others to break into the house. (ECF No. 38-1 at 6.)

In May 2019, the Shaws' house burned to the ground. (Compl. ¶ 18.) The Shaws submitted a second claim to Farm Bureau under the Policy. (Compl. ¶ 20; Ans. ¶ 8.) Farm Bureau assigned a separate claim number to the May fire and determined that the Policy covered it, too. (Compl. ¶¶ 22, 24; Ans. ¶ 8.) Farm Bureau also determined that the building was a total loss, (Compl. ¶ 19; Ans. ¶ 8), but did not pay the policy limit of $268,800. Instead, Farm Bureau paid the Shaws $108,991.48, representing the dwelling coverage limit on the Policy less the amount paid for the March fire. (Compl. ¶ 25; Ans. ¶ 8.) After Farm Bureau denied the Shaws' demand for the remaining portion of the dwelling coverage limit for the total loss of the house, the Shaws filed this breach of contract action against Farm Bureau. (Compl. ¶¶ 27–28; Ans. ¶ 8–9.) The Shaws seek $160,918.52, which is the difference between the dwelling coverage limit and amount paid by Farm Bureau for the May fire. (Compl. at 5.)

## ANALYSIS

### I.     Legal Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter

of law." Fed. R. Civ. P. 56(a). A dispute of fact is "genuine" if a factfinder could reasonably determine the issue in the non-moving party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A court considering a motion for summary judgment must view the facts in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences supported by the evidence. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). A party opposing a properly supported motion for summary judgment "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248. The mere existence of a factual dispute will not defeat a motion for summary judgment unless that dispute is "genuine," meaning that "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

**II.     The Record**

As an initial matter, the Court notes that the parties seek summary judgment based solely on the policy language. The facts in this case are gleaned from the Complaint, the Answer, the Policy, photographs of the Shaws' house after the March fire, and Mr. Shaw's deposition testimony. Those facts establish that: (1) the March fire resulted in a partial loss for which Farm Bureau paid the actual cash value; (2) between the fires, Farm Bureau did not reduce coverage on the Shaws' house; (3) the house was not restored to its original

4

condition before the May fire; and (4) the May fire resulted in a total loss of the house.[4] The parties' briefs muddy the waters a bit as to other facts, but the Court must decide the case based on the limited record before it. No party has requested discovery or argued that a genuine issue of material fact exists precluding summary judgment.

**III.   The Policy**

The Shaws maintain that, based on the plain language of the Policy, they are entitled to the full amount of dwelling coverage for the May fire. In Minnesota, the interpretation of an insurance policy is a question of law. *Volk v. Ace Am. Ins. Co.*, 748 F.3d 827, 828 (8th Cir. 2014) (citing *Am. Family Ins. Co. v. Walser*, 628 N.W.2d 605, 609 (Minn. 2001)). The Court interprets an insurance policy consistent with general principles of contract construction under Minnesota law, giving effect to the intent of the parties. *Jerry's Enters., Inc. v. U.S. Specialty Ins. Co.*, 845 F.3d 883, 887 (8th Cir. 2017) (citing *Thommes v. Milwaukee Ins. Co.*, 641 N.W.2d 877, 879 (Minn. 2002)). An insurance policy "must be construed as a whole, and unambiguous language must be given its plain and ordinary meaning." *Midwest Family Mut. Ins. Co. v. Wolters*, 831 N.W.2d 628, 636 (Minn. 2013) (citation omitted). Policy language is ambiguous if it is "susceptible to two or more

---

[4] For the purposes of these motions, the Court presumes that the total loss resulting from the May fire satisfies Minnesota's common law test for total loss. *See Auto-Owners Ins. Co. v. Second Chance Invs., LLC*, 812 N.W.2d 194, 198 (Minn. Ct. App. 2012) ("A building is not a total loss . . . unless it has been so far destroyed by the fire that no substantial part or portion of it above ground remains in place capable of being safely utilized in restoring the building to the condition in which it was before the fire.") (citation omitted).

5

reasonable interpretations," and is resolved in favor of the insured. *Id.* (citations omitted); *see Sicoli v. State Farm Mut. Auto. Ins. Co.*, 464 N.W.2d 300, 302 (Minn. Ct. App. 1990) ("Any ambiguities in the policy are to be strictly construed against the insurer, since the insurer drafted the agreement."). Each word in the policy should be interpreted to have meaning, rather than to be redundant or superfluous. *Econ. Premier Assurance Co. v. W. Nat'l Mut. Ins. Co.*, 839 N.W.2d 749, 756 (Minn. Ct. App. 2013). The court must "attempt to avoid an interpretation of the contract that would render a provision meaningless." *Chergosky v. Crosstown Bell, Inc.*, 463 N.W.2d 522, 526 (Minn. 1990).

*Each Occurrence.* The key provision of the Policy states that "[t]he coverages you chose apply to *each* accident, *'occurrence'* and loss that takes place during the policy period." (Policy at 10 (emphasis added).) The Shaws maintain that, based on the plain meaning of this provision, they are entitled to the full dwelling coverage limit for the May fire because it is undisputed that the March fire and the May fire were two separate occurrences, and the May fire was a total loss. (Compl. ¶¶ 26, 19; Ans. ¶ 8.) The Court finds that the plain language of this provision indicates that coverage applies to each "occurrence" that takes place during the policy period; a reasonable insured would understand this provision to mean that the full coverage amount applies to each occurrence. *See Midwest Family*, 831 N.W.2d at 636 ("Provisions in an insurance policy are to be interpreted according to both 'plain, ordinary sense' and 'what a reasonable person

6

in the position of the insured would have understood the words to mean.'") (citations omitted).

Even if the Court found the provision to be ambiguous, it would construe it in favor of the Shaws as the insureds because Farm Bureau failed to explicitly limit its liability for successive losses. *See generally O'Bryan v. Columbia Ins. Grp.*, 56 P.3d 789, 796 (Kan. 2002) (construing the policy in favor of the insured "because the policy does not specifically provide whether the $40,000 is the limit of liability for the entire policy period or per loss and the insurer's interpretations create an ambiguity" where insured sustained two successive fire losses and did not repair the structure after the first fire); *Michael v. Nat'l Sec. Fire & Cas. Co.*, 458 F. Supp. 128, 130 (N.D. Miss. 1978) ("[S]ince National Security failed to explicitly limit its liability in case of successive losses which might aggregate more than the face amount of the policy, the insured's interpretation as providing a maximum amount of $15,000 for each loss during the term of the policy is not unreasonable."). Farm Bureau does not argue otherwise; in its briefing, it ignores the "each occurrence" provision altogether.

The Shaws contend—and the Court agrees—that Farm Bureau could have drafted the Policy to limit coverage for successive occurrences within a policy period. In fact, it did so for another type of coverage. The Policy's Pollutant Cleanup and Removal Coverage provision states in part that Farm Bureau "will pay no more than $25,000 under this policy during any policy period *regardless of the number of losses* or the number of

7

modules providing this extra coverage." (Policy at 43 (emphasis added).) As the drafter of the Policy, it was fully within Farm Bureau's power to include language that would clearly exclude the risk of further liability for successive losses. *See Safeco Ins. Co. v. Lindberg*, 380 N.W.2d 219, 222 (Minn. Ct. App.), *aff'd,* 394 N.W.2d 146 (Minn. 1986) ("The insurer drafted this policy. It had the opportunity to clearly identify coverage and exclusions. It did not do so. Thus, it must bear the consequences."). Indeed, other insurers have done so. *E.g., Coats v. Farmers Ins. Exch.*, 230 S.W.3d 215, 218 (Tex. Ct. App. 2006) (noting policy language that "[e]ach time there is a loss to any building insured under Coverage A (Dwelling), the amount of insurance applicable to that building for loss by fire will be reduced by the amount of the loss. As repairs are made, the amount of insurance will be reinstated up to the limit of liability shown on the declarations page."). Because Farm Bureau failed to explicitly limit its liability in case of successive losses, the Shaws are entitled to the coverage for the May fire that may aggregate more than the face amount of the Policy.[5]

---

[5] The Policy also contains a provision allowing for the pro rata refund of the premium if the policy is cancelled. (Policy at 11.) In *O'Bryan*, the Kansas Supreme Court addressed a similar provision, noting that "[t]he policy does not contain a provision which would allow for a refund to be reduced based on the amount paid out under the policy. Thus, if the limit of liability was $40,000 for the entire policy period, an individual could arguably cancel the policy after having suffered a loss of any amount, including a loss totaling the full $40,000, and be refunded the pro rata portion of the premium. Such a cancellation provision is only logical if the $40,000 limit applied on a per loss basis." 56 P.3d at 794. Here, Farm Bureau did not refund any portion of the Shaws' premium after the March fire. (Compl. ¶ 16; Ans. ¶ 6.) Under the reasoning in *O'Bryan*, the Policy continued to cover the Shaws' house, without a reduction to the amount of coverage.

*Special Causes of Loss*. Farm Bureau seeks to avoid coverage by relying on the Special Causes of Loss provision in the Policy. The Policy provides that property listed in the declarations (including the Shaws' house) is insured "for the causes of loss indicated, including all loss or damage from fire." (Policy at 29; *id.* at 3 (declarations).) The Special Causes of Loss provision states that when the declarations indicate coverage for "Special Causes of Loss, coverage is provided for accidental direct physical loss except as excluded." (Policy at 29; *see also id.* at 35 ("Special Causes of Loss Index," stating in part "we insure your property as described in the Declarations for accidental direct physical loss except as excluded under the exceptions and limitations outlined below").) Farm Bureau contends that no reasonable insured could conclude from this policy language that it would be entitled to the windfall coverage sought by the Shaws because they are limited to "actual" accidental, direct, physical loss. (ECF No. 37 at 10–11.) But the word "actual" does not appear in these provisions, and Farm Bureau does not assert that any exclusion or limitation applies. Reading the Policy as a whole, including the "each occurrence" provision, the Court finds that the "Special Causes of Loss" provision and index do not preclude coverage to the policy limit for the May fire. (*See* Policy at 29 (providing that the provisions in the Policy's Property Section, which includes the Special Cause of Loss provision, "combined with the General Section [which includes the "each occurrence" provision] . . . provides the property coverages you selected, as identified in the Declarations").

*Total Loss Valuation*. The Policy's Total Loss Valuation provision states that, in the event of a "total loss," the coverage limit "represents the total value" of the insured dwelling; "[d]wellings in the process of being constructed shall be valued at the actual value of that portion of the dwelling completed at the time of loss." (Policy at 46.) Relying on this provision, Farm Bureau argues that the Shaws' house was arguably "in the process of being constructed" when the May fire occurred, and thus should be valued based on the portion of the house that was completed at the time of that fire. (ECF No. 37 at 11 (quoting Policy at 46).) The Shaws disagree, arguing that the house was not under construction; rather, the work done by Farm Bureau was merely a temporary repair covered under the Policy. (*See* Policy at 43 ("We will pay reasonable and necessary costs you incur to protect your property covered under [the dwelling module] from further damage after a covered loss.").) In its briefing, Farm Bureau describes its claim payment for the March fire as one to "facilitate repairs" on the Shaws' house. (ECF No. 37 at 2, 7, 11; *see id.* at 11 (explaining Farm Bureau "also had a crew out to the property to perform repairs to the roof between the first and second fires").) The Total Loss Valuation provision only addresses a dwelling "in the process of being constructed"; it does not mention the repair of a dwelling. (Policy at 46.) At other places, the Policy uses both the words "repair" and "construction," indicating that these words were intended to have different meanings. (*See id.* at 30 ("There is no coverage for loss or expense 'arising out of' the enforcement of any ordinance or law requiring or regulating the *construction*, *repair*

10

or demolition of a building . . .") (emphasis added)). Because the Court is to interpret each word in the Policy to have a meaning, rather than be redundant or superfluous, *Econ. Premier Assurance*, 839 N.W.2d at 756, Farm Bureau's repair to the Shaws' house does not mean the house was "in the process of being constructed" for the purpose of the Total Loss Valuation provision.

Contrary to Farm Bureau's assertion, the phrases "under construction" and "in the process of being constructed" do not necessarily include reconstruction, renovation, or repair of existing structures.[6] (ECF No. 41 at 2.) Courts, including the Eighth Circuit, have found that the terms "construction" and "being constructed" do not include renovations or repairs for the purposes of vacancy exclusions. *E.g., Vennemann v. Badger Mut. Ins. Co.*, 334 F.3d 772, 774 (8th Cir. 2003) (holding that "remodeling and refurbishing projects do not qualify [a] claim for the 'being constructed' exception to the vacancy exclusion clause"

---

[6] Farm Bureau cites non-Minnesota case law regarding vacancy exclusions that the Court does not find persuasive in this context. (ECF No. 41 at 2, first citing *TRB Invs., Inc. v. Fireman's Fund Ins. Co.*, 145 P.3d 472, 478 (Cal. 2006) ("[T]he proper inquiry for determining whether a building is 'under construction' for purposes of defining an exception to the vacancy exclusion is whether the building project, however characterized, results in 'substantial continuing activities' by persons associated with the project at the premises during the relevant time period."); then citing *Warren Davis Props. V, L.L.C. v. United Fire & Cas. Co.*, 111 S.W.3d 515, 522 (Mo. Ct. App. 2003) ("Construing the reasonable definition of construction in favor of the insured, we find that activities encompassing the renovation of a building are construction" for a vacancy exclusion); and then citing *Brouillette v. Phx. Assur. Co.*, 340 So. 2d 667, 670 (La. Ct. App. 1976) (rejecting "the proposition that unless the building was constructed from the beginning and this process was still going on at the time of the loss the [vacancy exclusion] policy provision does not apply").)

of a Minnesota homeowner's policy where "no projects were in progress when the fire occurred"); *Myers v. Merrimack Mut. Fire Ins. Co.*, 788 F.2d 468, 472 (7th Cir. 1986) (noting several state courts have held that the term "construction" in a vacancy exclusion "does not include repairs, maintenance, reconstruction, renovation and the like" to an existing structure). Since the Total Loss Valuation provision does not include an exception for repairs, and since the term "construction" must mean something other than repair under the terms of the Policy, the Total Loss Valuation does not preclude coverage to the policy limits in this case. Rather, because the May fire was indisputably a "total loss," the total value of the Shaws' house is the dwelling coverage limit of $268,800.

### IV.     Minnesota Fire Insurance Policy Statutes

Having found that the policy language supports coverage to the policy limits, the next question is whether Minneapolis fire insurance policy statutes, Minn. Stat. § 65A.01 *et seq.*, render the plain meaning of the Policy inapplicable. *See Watson v. United Servs. Auto. Ass'n*, 566 N.W.2d 683, 690 (Minn. 1997) (explaining that when a policy provision directly conflicts with a Minnesota fire insurance policy statute, "the statute's conformity clause operates to substitute the statutory provisions for the policy provision," but insurers may incorporate different or additional policy terms "offer[ing] more coverage than the statutory minimum"). The purposes of the Minnesota fire insurance policy statutes are to "prevent overinsurance by requiring prior valuation" and "avoid litigation

by prescribing definite standards of recovery in case of total loss." *Auto-Owners Ins.*, 827 N.W.2d at 770 (quoting *Nathan v. St. Paul Mut. Ins. Co.*, 68 N.W.2d 385, 388 (Minn. 1955)).

Minnesota Statutes Section 65A.01, subdivision 5, states that "[n]o provision shall be attached to or included in such policy limiting the amount to be paid in case of total loss on buildings by fire, lightning or other hazard to less than the amount of insurance on the same." Minn. Stat. § 65A.01, subdiv. 5; *see Watson*, 566 N.W.2d at 690 (noting Minn. Stat. § 65A.01, subdiv. 5, has a remedial purpose and "must be broadly construed"); *Auto-Owners Ins.*, 827 N.W.2d at 770 (holding that, in the case of a total loss, Minn. Stat. § 65A.01, subdiv. 5, requires an insurer to pay a policyholder an amount equal to the limit of insurance). Minnesota Statutes Section 65A.08, subdivision 2, also known as the valued-policy statute, provides in part that:

> In the absence of any change increasing the risk, without the consent of the insurer, of which the burden of proof shall be upon it, and in the absence of intentional fraud on the part of the insured, *the insurer shall pay the whole amount mentioned in the policy or renewal upon which it receives a premium, in case of total loss*, and in case of partial loss, the full amount thereof.

Minn. Stat. § 65A.08, subdiv. 2(a) (emphasis added); *see White v. N.H. Ins. Co.*, 390 N.W.2d 313, 314 (Minn. Ct. App. 1986) (referring to Minn. Stat. § 65A.08, subdiv. 2 as the "valued policy statute"). When a court considers whether an insurer is required to pay the limit of insurance, "the key inquiry is whether a total loss has occurred as opposed to whether the amount of loss or damage meets a certain threshold." *Auto-Owners Ins.*, 827 N.W.2d at 770. Farm Bureau acknowledges that under the valued-policy statute,

13

"insurers are held to their valuation of the property at the time the policy is issued unless circumstances beyond their control magnify the risk." (ECF No. 37 at 6.) But no court construing Minnesota law has considered the question raised here—whether the valued-policy statute applies to successive losses within a single policy period.[7]

Farm Bureau contends that, at the time of the May fire, the Shaws' house was no longer intact and thus could only be a partial loss under the valued-policy statute. (ECF No. 37 at 7.) Arguing that the valued-policy statute presupposes a fully intact building, it claims that the March fire and May fire together resulted in a total loss, and between the claims for the two fires, Farm Bureau paid the stated value of the dwelling. (*Id.* at 7–8.) Farm Bureau maintains that this case is analogous to *White v. New Hampshire Insurance Co.*, in which an insured sought to apply the valued-policy statute to a construction project that was damaged by a fire when it was approximately eighty-five percent completed. 390 N.W.2d at 314. The Minnesota Court of Appeals held that the valued-

---

[7] Courts in other jurisdictions with valued-policy laws have considered the impact of successive losses on the amount owed to insureds for a second loss, with different outcomes. *See, e.g., O'Bryan*, 56 P.3d at 795–96 (adopting "modern view" that the total policy limit applies to successive losses); *Hall v. Allstate Ins. Co.,* 324 S.E.2d 341, 343 (S.C. Ct. App. 1984) (holding insurer must pay full coverage amount for second fire that destroyed insured property where it retained the insured's premium, even though damage from first fire had not been repaired); *Com. Union Ins. Co. of Am. v. Stanmike Inv. Co.,* 475 S.W.2d 295, 298 (Tex. Ct. App. 1971) (holding insurer was entitled to credit against recovery of face value of policy for amount paid for prior wind damage, which had not been repaired before fire destroyed insured property); *Lancashire Ins. Co. v. Bush*, 82 N.W. 313, 314 (Neb. 1900) (holding that amount of recovery for second fire that destroyed insured property was reduced by amount paid for damage resulting from previous fire, which had not been repaired).

policy statute did not apply to the builder's risk insurance policy, and that the insured properly recovered the actual value of the building at the time of its destruction. *Id.* at 316. But in *White*, the court found that the policy was not within the scope of the valued-policy statute because the policy "clearly provide[d]" that coverage was based on "the actual value of the building at the time of destruction, supplies on the premises to be used in the building, and equipment," and the enumerated policy value was "the *limit* of losses that [the insurer] agreed to cover." *Id.* (emphasis in original). Farm Bureau does not point to any similar language in the Policy at issue here.

The Shaws rely on *Johnson v. Madelia Lake Crystal Mutual Insurance Co.*, in which the insurer paid a claim after fire damaged an underinsured horse stable. No. A03-820, 2004 WL 61057, at *1 (Minn. Ct. App. Jan. 13, 2004). Despite the insured's failure to repair the building, the insurer issued a renewal policy, and the insured paid the premium for the next policy period. *Id.* at *2. During the next policy period, the building collapsed due to the weight of ice and snow, a covered event under the policy. *Id.* The Minnesota Court of Appeals held that the insurer's exposure was the coverage amount stated in the policy, and rejected the argument that policy provisions reduced the coverage amount. *Id.* at *1.

Farm Bureau attempts to distinguish *Johnson* based on several facts: (1) the second loss occurred in a different policy period for which the insured had paid the premium; (2) the insured asked for and received a policy for the building in its post-fire condition; (3) the building was underinsured; and (4) the insurer had the opportunity to place a

15

value on the building in its post-fire condition and set a premium for that coverage. (ECF No. 37 at 8–9.) These differences do not compel a different result. Farm Bureau was aware of the March fire and resulting damage, as it paid the Shaws' claim and hired a crew to secure their roof. The Policy provided coverage for "each occurrence," and did not require the Shaws to renew under new terms after the March fire. (ECF No. 40 at 4–5.) And Farm Bureau could have, but chose not to, change the Policy terms after the March fire. (*See* Policy at 11 ("Our right to . . . reduce coverage applies to each coverage or limit in this policy."); Compl. ¶¶ 15–16; Ans. ¶ 6.)

Farm Bureau also contends that the valued-policy statute does not apply to the May fire because the March fire resulted in a large hole in the house's exterior wall that was open to the elements and intruders, thereby increasing the risk of further loss. (ECF No. 37 at 5–6.) An insurer may "introduc[e] evidence relative to any change subsequent to the date the insurance was issued if the change results in an increase in the risk of loss which existed at the time the loss occurred." *Nathan*, 68 N.W.2d at 390. Farm Bureau presents little evidence that the hole in the Shaws' house resulted in an increased risk of loss—a few photographs of the house and excerpts of Mr. Shaw's testimony regarding vandalism and efforts to break into the house. (ECF No. 38-1.) At the hearing, Farm Bureau asked the Court to take judicial notice of the increased risk. The Shaws objected, arguing that Farm Bureau offers no evidence (*e.g.*, testimony from an underwriter or insurance adjustor) to support a judicial finding that the hole in the wall constituted an

16

increase in risk such that the valued-policy statute should not apply. "What constitutes an increase of risk is a question of fact for the jury unless the increase is obvious." *Nathan*, 68 N.W.2d at 390. The Court declines to take judicial notice of an increased risk here because it is not sufficiently obvious. *Cf., e.g., Schaffer v. Hampton Farmers' Mut. Fire Ins. Co.*, 235 N.W. 618, 619 (Minn. 1931) (finding evidence that operating "an illicit distillery," including coal and gasoline stoves, in an ordinary barn "obviously increase[d] [the] fire hazard"); *Betcher v. Cap. Fire Ins. Co.*, 80 N.W. 971, 972 (Minn. 1899) ("Even if there was no direct evidence on the question, we would take judicial notice of the fact that the storage of [a large stock of fireworks in the insured building] caused an increase of the risk."). Rather, the increased risk of fire is "subject to reasonable dispute" and cannot "be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b).

Even if the hole in the house could be considered an increased risk of loss, the valued-policy statute also requires that Farm Bureau prove that the increased risk was "without the consent of the insurer." Minn. Stat. § 65A.08, subdiv. 2. Farm Bureau has not met this burden. Despite knowledge of the partial loss and securing the Shaws' roof after the March fire, Farm Bureau took no action to reduce coverage on the Policy or refund a portion of the premium after the March fire, nor did it take any action consistent with a lack of consent to the Shaws' handling of the house. (Policy at 11 ("Our right to . . . reduce coverage applies to each coverage or limit in this policy."); *id.* ("The premium is

17

based on information we received from you or other sources. . . . Your premium may be adjusted accordingly."); Compl. ¶¶ 15–16; Ans. ¶ 6.)

The Court is also unpersuaded by Farm Bureau's argument that the May fire was actually a partial loss (rather than total) because the house had not been repaired after the March fire. Farm Bureau has admitted that the May fire caused the total loss; it cannot now claim otherwise. (Compl. ¶ 19; Ans. ¶ 8 (admitting that the May fire was a "total loss," without any caveat or reference to the March fire)); *see Auto-Owners Ins.*, 827 N.W.2d at 772 ("[W]hen the loss is determined to be total, the payout to the insured is fixed at the limit of insurance."). In addition, Farm Bureau provides no evidence that the total loss of the Shaws' house was a result of the combination of the fires. At the summary judgment stage of litigation, Farm Bureau may not rest on mere allegations, but must offer specific facts showing a genuine issue. *Anderson*, 477 U.S. at 248.

For these reasons, the Court finds that the May fire falls within Minnesota's valued-policy statute and resulted in a total loss. As such, Farm Bureau is obligated to pay the full coverage limit listed in in the Policy for the May fire.

## CONCLUSION

Based on the foregoing and on all the files, records, and proceedings herein, IT IS HEREBY ORDERED THAT:

1. Plaintiffs' Motion for Summary Judgment (ECF No. 28) is GRANTED; and

2. Defendant's Cross-Motion for Summary Judgment (ECF No. 35) is DENIED.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated: February 1, 2021                     BY THE COURT:

                                                                         s/Nancy E. Brasel
                                                                         Nancy E. Brasel
                                                                         United States District Judge